IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 3, 2022

**STATE OF TENNESSEE v. BRANDON CARDELL COMAN, JR.**

**Appeal from the Circuit Court for Madison County**
**No. 19-797-B    Donald H. Allen, Judge**

_____

**No. W2020-01684-CCA-R3-CD**

_____

The pro se defendant, Brandon Cardell Coman, Jr., appeals his Madison County Circuit Court jury conviction of aggravated robbery, arguing that the trial court erred by admitting certain evidence, excluding certain evidence, denying a motion to suppress certain evidence, denying the defendant's request for new counsel, denying a motion to dismiss the charges; that the evidence was insufficient to support his conviction; and that his trial was tainted by prosecutorial misconduct.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and TIMOTHY L. EASTER, JJ., joined.

Harold Dorsey, Alamo, Tennessee (at trial), for the appellant Brandon Cardell Coman, Jr., and Brandon Cardell Coman, Jr., pro se (on appeal).

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Matt Floyd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On September 30, 2019, the Madison County Grand Jury charged the defendant and co-defendant Christina En Clark-Smith with one count of the aggravated robbery of Fleming Ivory.  Despite being represented by counsel, the defendant filed several pro se pretrial motions, including a motion to sever his trial from that of his co-defendant, a motion to dismiss the case, a motion to dismiss the indictment, and two

motions to suppress evidence.[1]

At the August 27, 2020 trial,[2] Jeff Cates, the general manager of the Quality Inn at 535 Wiley Parker Road in Jackson, testified that he provided the Jackson Police Department ("JPD") with copies of the hotel's video surveillance from June 11, 2019. He said that the timestamp on the video recordings were "always one hour ahead exactly."

Fleming Ivory, the victim, testified that in June 2019, he was living in Memphis but that he "was going back and forth from Memphis to Nashville for business." During one business trip, he travelled to Jackson where he met Ms. Clark-Smith at the Subway restaurant where Ms. Clark-Smith worked. The victim said that he and Ms. Clark-Smith began texting and calling each other "[p]robably every day." He said that they "were getting to know each other and then we communicated about going out on a date, you know, about dinner and then it became adult conversation." The victim said that he checked into room 216 at the Quality Inn on June 10 and that he and Ms. Clark-Smith had arranged to meet. The victim picked up Ms. Clark-Smith in the early morning hours of June 11 from "in front of her house near the . . . Lambuth College area," and the two went to the victim's hotel room, arriving at approximately 1:40 a.m.

Shortly after returning to the hotel, the victim left the room to get some ice, and "a minute or so" after he returned, at 1:52 a.m., "there was a knock on the door and Christina went to open the door and the gentleman pushed the door on open and came in and pulled out a gun." The victim identified the defendant as the man with the gun, which the victim described as "a black handgun." The victim identified a photograph of the defendant holding "a black gun," which appeared to be the same gun that the defendant used during the robbery.

The victim said that when the defendant entered the hotel room, the defendant asked "'Is this the n*****?,'" at which point, the victim "kind of freaked out," and the defendant "told me to empty my pockets" and "give him my cell phone." The victim gave the defendant his cellular telephone and wallet, which included his "[c]redit cards, debit card, driver's license, [and] social security card." The victim explained that he complied with the defendant's instructions because "I was very afraid that I was going to die." The victim recalled that the defendant stated "[s]everal times . . . that he would kill me. He stated that he would torture me." When the defendant first entered the room, Ms. Clark-Smith "was just standing there and then [the defendant] gave the gun to her."

---

[1]   The trial record does not include dispositions on these motions or transcripts of any motion hearings. The defendant was tried alone, but it is unclear whether the trial court granted his motion for severance or whether his co-defendant pleaded guilty.

[2]   It appears from the record that the defendant's first trial resulted in a hung jury and mistrial and that he was retried in August 2020.

The victim said that he "never carr[ied] cash" but that he was "trying to do cash app" to transfer money. The defendant "had [Ms. Clark-Smith] do the cash app." After Ms. Clark-Smith transferred money via the "cash app," the defendant "told me to go and sit in the tub in the bathroom and he told me if I come out before a certain amount of time that he would kill me. So then I followed his instructions." At that point, the defendant and Ms. Clark-Smith left, taking the victim's cellular telephone and car keys. The victim waited in the bathtub "long enough for them to get out of there," then he called the hotel's front desk and asked them to call the police.

The victim provided the police with Ms. Clark-Smith's contact information. He also "went on [Ms. Clark-Smith's] Face[b]ook page" and discovered photographs of the defendant, which photographs he provided to the police. The photographs showed the defendant's distinctive "body tattoo," which the victim "noticed the night of the robbery." The victim said that he was unable to recover any of his stolen belongings or the money that was transferred via the cash app.

During cross-examination, the victim testified that he first met Ms. Clark-Smith on June 7 or 8, 2019. He said that they "both were flirting with each other" and that Ms. Clark-Smith gave him her cellular telephone number. Although the victim acknowledged that the two "began to communicate daily back and forth," he denied that they were in a relationship. The victim said that in their text exchanges, he and Ms. Clark-Smith talked "about her schooling" and job. The victim acknowledged that in one text exchange, he offered to send Ms. Clark-Smith a "naughty picture" of himself. Ms. Clark-Smith replied, "'Yea send one,'" and the victim said, "'If you like feel free to send one back.'" Ms. Clark-Smith responded, "'Mine's not for free tho.'" In another text exchange, Ms. Clark-Smith asked, "Monday when you come you go give me some money ? . . . I'm broke as a joke r[ight] n[ow] I thought I was getting paid Friday NOPEEE. Ion get my check till next Friday and I got shit that need to be done and yeah I do." The victim replied, "Yes." The victim acknowledged that he and Ms. Clark-Smith exchanged explicit, sexual messages but denied that she had agreed to have sex with him for money on Monday, June 10, 2019, saying, "We were planning on meeting up to go out on a date[,]" "but there was no agreement of quid pro quo if I have sex with you I've got to pay you."

The victim said that when the defendant came to his hotel room, the defendant "forced himself in" "[a]fter the door was slightly open" and remained in the room for 16 minutes. The defendant and Ms. Clark-Smith left the hotel room together. The victim denied that he argued with the defendant about how much money he owed Ms. Clark-Smith. He recalled that the defendant told Ms. Clark-Smith to do something to the victim's cellular telephone "to disable where you can't track it" "and making it where you can change the cloud, making it where you can change the owner."

-3-

Ted Maxwell, an investigator with the Madison County Sheriff's Department, testified that inmates at the Madison County jail are assigned an individualized personal identification number ("PIN"). To use the telephones, an inmate uses the PIN and a personal password. He said that the jail maintains records of who places calls and to which telephone numbers. They also record the telephone conversations after notifying both the inmate and the call recipient that the call is being recorded. Investigator Maxwell identified recorded telephone conversations between the defendant and Ms. Clark-Smith.

Investigator Maxwell said that the jail also had video conferencing for visitors to the jail, which system requires visitors to present identification and "put in all of their personal informa[tion]," including their name, email address, and a telephone number. All video conferences are recorded. Investigator Maxwell identified a recording of a video conversation between the defendant and Ms. Clark-Smith.

On cross-examination, Investigator Maxwell acknowledged that the jail's telephone system records the identity of the inmate based on the inmate's PIN and that it was possible for an inmate to use someone else's PIN and password.

JPD Sergeant Adam Pinion testified that on July 11, 2019, he learned that an arrest warrant had issued for the defendant and that the defendant was scheduled to visit the Madison County jail. Sergeant Pinion went to the jail and arrested the defendant. He seized two cellular telephones from the defendant.

JPD Sergeant Robert Groves, who worked as the lead investigator in this case, testified that he interviewed the victim and developed Ms. Clark-Smith as a suspect, who was arrested "[t]he day after the alleged robbery." He collected the surveillance video recording from the hotel. The victim provided Sergeant Groves with "screen shots from a Face[b]ook page that was connected to [Ms. Clark-Smith]" that showed a man that the victim identified as the perpetrator.

Sergeant Groves reviewed Ms. Clark-Smith's recorded jailhouse telephone and video calls, "listen[ing] to hours of . . . calls" between Ms. Clark-Smith and a man and heard them reference the robbery of the victim "[m]ultiple times." In one call, Ms. Clark-Smith "said something to the effect of I'm so excited you're coming to see me on Wednesday," and through reviewing the visitation schedule, Sergeant Groves determined that Ms. Clark-Smith had been talking with the defendant. Based upon the content of the recorded telephone calls, Sergeant Groves obtained an arrest warrant for the defendant.

Sergeant Groves, who was trained on cellular telephone data extraction, examined the telephones seized from the defendant. He obtained the defendant's four-digit

-4-

passcode to a red iPhone XR from a recorded telephone call in which the defendant provided the code to his mother. Pursuant to a search warrant, he extracted data from the telephone. On June 8, 2019, in a text exchange between Ms. Clark-Smith and the defendant, Ms. Clark-Smith asked, "'Trynna rob somebody with me?,'" and the defendant responded, "'Yea[.]'" Ms. Clark-Smith then texted, "'Ok Monday I got a dude we robbing[.]'" Sergeant Groves noted that the Monday after these messages were sent was June 10, 2019, the date that Ms. Clark-Smith arranged to meet the victim. Beginning on June 10, the following text exchange occurred between Ms. Clark-Smith and the defendant:

| Date and Time | From | To | Message |
| --- | --- | --- | --- |
| June 10, 2019, 10:27 p.m. | Ms. Clark-Smith | The defendant | Hold on baby |
| June 10, 2019, 11:08 p.m. | Ms. Clark-Smith | The defendant | Dude trynna come get me |
| June 10, 2019, 11:09 p.m. | The defendant | Ms. Clark-Smith | I'm On my way! |
| June 10, 2019, 11:09 p.m. | Ms. Clark-Smith | The defendant | Fr[3] |
| June 10, 2019, 11:09 p.m. | The defendant | Ms. Clark-Smith | Yeah nana finna pull up I got the gun so what u tryna do |
| June 10, 2019, 11:10 p.m. | Ms. Clark-Smith | The defendant | What we planned on |
| June 10, 2019, 11:12 p.m. | The defendant | Ms. Clark-Smith | Yea |
| June 10, 2019, 11:38 p.m. | The defendant | Ms. Clark-Smith | On my way! Now |
| June 11, 2019, 1:31 a.m. | Ms. Clark-Smith | The defendant | I'm with him |
| June 11, 2019, 1:31 a.m. | The defendant | Ms. Clark-Smith | Ok |
| June 11, 2019, 1:34 a.m. | The defendant | Ms. Clark-Smith | U ok |
| June 11, 2019, 1:34 a.m. | Ms. Clark-Smith | The defendant | Yeah he weird |
| June 11, 2019, 1:35 a.m. | Ms. Clark-Smith | The defendant | On our way there |
| June 11, 2019, 1:35 a.m. | The defendant | Ms. Clark-Smith | Let me know what room number |

---

[3]     Sergeant Groves explained that "Fr" "in text lingo means for real."

| June 11, 2019, 1:35 a.m. | The defendant | Ms. Clark-Smith | We almost there |
|---|---|---|---|
| June 11, 2019, 1:39 a.m. | The defendant | Ms. Clark-Smith | I'm here |
| June 11, 2019, 1: 43 a.m. | Ms. Clark-Smith | The defendant | Me to and ok |
| June 11, 2019, 1:43 a.m. | The defendant | Ms. Clark-Smith | Was the room number |
| June 11, 2019, 1:45 a.m. | The defendant | Ms. Clark-Smith | ?? |
| June 11, 2019, 1:45 a.m. | Ms. Clark-Smith | The defendant | 216 |
| June 11, 2019, 1:53 a.m. | The defendant | Ms. Clark-Smith | Whats going on |

From the defendant's cellular telephone, Sergeant Groves extracted a photograph of the defendant holding a gun. He also extracted two photographs showing "the front and back of a blue iPhone XR," which matched the description of the victim's cellular telephone. He noted that the telephone in the photograph displayed "the date of Tuesday, June the 11th, on the face of the iPhone" and the time of 10:41. Sergeant Groves testified that a screen shot taken from the defendant's telephone showed a cash transfer from the victim via a "cash app" for $150 at 2:21 a.m.

In a July 14, 2019 recorded telephone call, the defendant instructed someone identified only as "NaNa," to get an item that the defendant had placed in a closet and try to sell it. He told her to "be careful" and "to take the thing out . . . because there's one in the thing," instructing her to "press the button on the side," and "pull it back." Sergeant Groves testified that based on his training of arming and disarming semiautomatic handguns, he believed that the defendant was instructing "NaNa" on how to disarm a semiautomatic handgun. He said that the photograph of the defendant holding a gun appeared to show a semiautomatic handgun.

In another recorded telephone call, the defendant instructed the person on the other end of the call to "log in on my iCloud . . . and deactivate my iPhone XR, the red one" by going to the "find my iPhone" application and setting the telephone to "lost mode," which setting Sergeant Groves explained would cause the telephone to "display a note basically on the home screen that you can't do anything with. It just says if found please contact this phone number." Sergeant Groves said that, upon hearing that telephone call, he "took preservation measures to keep the iPhone from connecting to the network so I basically took the SIM card out of it and attempted to place it in airplane mode" to prevent remote deactivation.

During cross-examination, Sergeant Groves testified that the hotel's security camera footage showed the defendant entering the victim's hotel room at 1:52 a.m. He acknowledged that the defendant's cellular telephone records indicated that he texted Ms. Clark-Smith, "'Whats going on'" at 1:53 a.m. The sergeant explained that "[t]here is a difference in the time stamps" and that the time stamps on the defendant's cellular telephone and the hotel's security camera "are not synced." He acknowledged that he identified the blue cellular telephone recovered from the defendant as belonging to the victim based only on the victim's description of the telephone.

On redirect examination, Sergeant Groves said that the time stamps on surveillance videos are "quite frequent[ly]" inaccurate or different from the time displayed on a cellular telephone. He explained that Apple devices all displayed a time consistent with Apple's standard time but that the video surveillance system was not set to Apple time. He also explained that video surveillance systems "are not connected to the internet so they have no way to auto-update their times."

The State rested. After a *Momon* colloquy, the defendant elected not to testify but put on proof.

JPD Investigator Paul Bozza testified that he responded to the Quality Inn hotel on Wiley Parker Road on June 11, 2019. He took a statement from the victim and prepared "the initial report" that "same morning." The victim told the investigator that he first saw the defendant "[a]fter he got back from getting ice when he walked back into the room." The victim told the investigator that when he returned to the room, the defendant was there with a gun. Investigator Bozza said that the victim described the gun as "a small silver revolver."

The defendant rested.

The jury convicted the defendant as charged, and, after a sentencing hearing, the trial court sentenced him as a Range I offender to 12 years' incarceration, which sentence was aligned consecutively to two prior, unrelated cases.

The defendant filed a timely but unsuccessful motion for new trial, which motion alleged that the evidence was insufficient to support his convictions and asked the trial court "to reconsider it's [sic] finding that the maximum sentence is appropriate in this case."

After filing the motion for new trial, trial counsel moved to withdraw, noting "that the attorney/client relationship has deteriorated to the point that the defendant should

obtain another lawyer." The trial court denied counsel's motion to withdraw but scheduled a hearing for December 21, 2020, "for the purposes of hiring a new attorney."[4] Trial counsel filed the defendant's notice of appeal on December 16, 2020. The defendant's attorney did not timely file a brief, and this court twice notified him that the defendant's brief was overdue. *See State v. Brandon Coman*, No. W2020-01684-CCA-R3-CD (Tenn. Crim. App., Jackson, July 30, 2021) (order). The defendant's attorney filed a motion to supplement the record and a motion for an extension of time in which to file the appellate brief, and this court granted those motions on July 12, 2021. *State v. Brandon Coman*, No. W2020-01684-CCA-R3-CD (Tenn. Crim. App., Jackson, July 12, 2021) (order). On July 6, 2021, the defendant moved to proceed pro se on appeal, and, on July 30, 2021, this court remanded the case to the trial court "for the purpose of conducting a hearing to determine whether the [defendant] has knowingly and intelligently waived his right to counsel." *Id.*

On remand, the trial court found that the defendant knowing and voluntarily waived his right to appellate counsel, and on August 31, 2021, this court entered an order, permitting counsel to withdraw from representation.

In this appeal, the pro se defendant enumerates myriad issues, but he provided argument for only three issues: (1) whether the evidence was sufficient to support his conviction, (2) whether the State committed prosecutorial misconduct by arguing facts outside the record, and (3) whether the trial court erred by denying his motions to suppress evidence collected from cellular telephones. The defendant has waived the remaining issues by failing to address them in the argument of his brief. *See* Tenn. R. Ct. Crim. App. 10 ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

## I. Sufficiency of the Evidence

The defendant contends that the State failed to present sufficient evidence to support his conviction of aggravated robbery. We disagree.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of

---

[4] Neither the transcript of that hearing nor any order related to the outcome of that hearing is included in the record.

the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a]ggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401.

Here, the evidence established that on June 8, 2019, the defendant and Ms. Clark-Smith planned to rob someone on Monday, June 10. Ms. Clark-Smith identified the victim and arranged to meet with him for a date. In the early morning hours of June 11, the victim picked up Ms. Clark-Smith and drove her to the Quality Inn where the victim was staying in room 216. At 1:45 a.m., Ms. Clark-Smith texted the defendant the victim's room number, and at 1:52 a.m., the defendant knocked on the victim's door. Ms. Clark-Smith answered the door, and the defendant pushed his way into the hotel room and pulled a gun on the victim. The defendant ordered the victim to empty his pockets and took the victim's cellular telephone, wallet, and car keys. Ms. Clark-Smith used a cash transfer application on the victim's telephone to transfer money to the defendant. The defendant then ordered the victim into the bathtub, and he and Ms. Clark-Smith fled the scene together. This evidence is sufficient to support the defendant's conviction of aggravated robbery.

The defendant asserts that his cellular telephone records indicate that he sent a text message at 1:53 a.m. but that the perpetrator visible on the hotel's video surveillance footage from 1:52 to 1:55 a.m. did not "pull out his cell phone and attempt to send a text" during that time. Sergeant Groves testified, however, that surveillance videos do not synchronize with a standard clock and frequently display an inaccurate time. It was the responsibility of the jury to weigh the credibility of the evidence, and in doing so, they accredited the State's explanation for the minor time discrepancy, as was their prerogative.

*II. Prosecutorial Misconduct*

Next, the defendant argues that the prosecutor argued facts outside the record. Specifically, the defendant asserts that the State argued that the defendant and Ms. Clark-Smith were discussing the robbery of the victim in recorded jailhouse telephone calls despite the subject of the conversations not being in evidence. The defendant also asserts that the State argued that the blue iPhone XR recovered from the defendant belonged to the victim but that the State failed to establish that it was the victim's

telephone. The State argues that the defendant has waived this issue for failure to include it in his motion for new trial. Alternatively, the State argues that the defendant is not entitled to relief.

On appeal, claims of prosecutorial misconduct not raised in a motion for new trial are waived. Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . the misconduct of . . . parties or counsel . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). As the State points out, in his motion for new trial, the defendant raised only the issues of sufficiency of the evidence and sentencing. Consequently, the defendant has waived his claim of prosecutorial misconduct.

Whether properly assigned or not, however, this court may, "[w]hen necessary to do substantial justice, . . . consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial." Tenn. R. App. P. 36(b). This court will grant relief for plain error only when:

> (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). The party claiming plain error bears the burden of satisfying all five criteria as a prerequisite to plain error review. *See id.* Because each factor must be established, we need not consider all five factors when a single factor indicates that relief is not warranted. *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). "[A]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Fayne*, 451 S.W.3d at 372 (citation omitted) (alterations in *Fayne*).

Here, the defendant cannot avail himself of plain error review because the record does not "clearly establish[] what occurred in the trial court." *See Hatcher*, 310 S.W.3d at 808. The record does not contain the parties' closing arguments, and, consequently, it is insufficient to facilitate our review. This court "may only review what is in the record and not what might have been or should have been included." *State v.*

*Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993) (citing *Dearborne v. State*, 575 S.W.2d 259, 264 (Tenn. 1978)). The defendant as the appellant, bore the burden to prepare an adequate record for appellate review, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), and, "[w]hen the record is incomplete and does not contain information relevant to a particular issue, this court may not make a ruling," *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993) (citing *State v. Cooper*, 736 S.W.2d 125, 131 (Tenn. Crim. App. 1987)).

## *III. Suppression*

The defendant argues that the trial court erred by denying his motions to suppress evidence collected from his cellular telephone, alleging that the searches were performed pursuant to invalid search warrants. Specifically, he argues that the search warrants did not correctly indicate the "time of day that the warrant was issued" and that because the warrants failed to state whether the time of issuance was a.m. or p.m., they "fail[ed] to comply with the mandatory requirements of [criminal procedure] Rule 41." The State argues that the defendant has waived this issue for, among other things, failing to raise it in his motion for new trial.

Evidentiary issues not raised in the motion for new trial are waived on appeal. Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial."). Because the defendant did not raise this issue in his motion for new trial, our review is limited to plain error. *See* Tenn. R. App. P. 36(b).

The defendant, again, cannot avail himself of plain error review in this matter because the record does not clearly establish what occurred in the trial court. Before trial, the defendant filed two pro se motions to suppress evidence collected from the defendant's cellular telephone. The appellate record, however, is devoid of any ruling or proceedings on the motions to suppress, and consequently, the record is inadequate to facilitate our review.

## *Conclusion*

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-11-